DGR:BW
F. # 2022R00165

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                     Docket No. 22-CR-136 (RPK)

ALEXEY GAVINO,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN FURTHER OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Benjamin Weintraub
Assistant U.S. Attorney
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in further opposition to the defendant's motion to suppress evidence obtained pursuant to manual and forensic searches of the defendant's cell phone in the above-captioned case. The manual search was conducted as part of a routine border search at John F. Kennedy International Airport ("JFK"). The forensic search was conducted pursuant to a valid search warrant obtained after law enforcement officers discovered child pornography during the manual search and seized the cell phone. Based upon the evidence presented at the August 14, 2023 evidentiary hearing, the defendant's claims are unavailing and his motion should be denied in its entirety.

I.   FACTUAL BACKGROUND[1]

On August 30, 2021, the defendant traveled from the Dominican Republic to JFK. See August 14, 2023 Evidentiary Hearing Transcript ("Tr.") 24:10-16. CBP Officer Joseph Sottile ("Officer Sottile") was on duty that day, and assigned to JFK. (Id. 6:4-5; 23:24-24:1). Officer Sottile was a member of CBP's Passenger Intelligence Enforcement Response ("PIER") unit, which focused on the identification of evidence of narcotics and human trafficking offenses. (Id. 6:21-22). As part of his duties, Officer Sottile reviewed the CBP system for information relevant to his work on the PIER team. (Id. 24:22-25:3).

Prior to the defendant's arrival at JFK, Officer Sottile read a "one-day lookout" that had been placed in the CBP system flagging the defendant for a secondary inspection upon his arrival into the United States. (Id. 24:19-24). Through his review of the entry, Officer Sottile learned that in 2019 approximately $37,000 in cash had been seized from the defendant while he

---

[1] The facts set out below are drawn from the testimony of United States Customs and Border Protection ("CBP") Officer Joseph Sottile, who testified at the August 14, 2023 evidentiary hearing.

was traveling from Dallas to Los Angeles.  (Id. 24:25-25:8).  Officer Sottile also learned that the defendant never retrieved the $37,000 after it was seized, despite the fact that passengers who have money seized at the airport can request the return of the seized funds at a later date.  (Id. 25:19-26:3).

At the time he read the lookout, based on the facts contained in the lookout, including the large quantity of cash seized from the defendant and Officer's Sottile's belief that California is a common marijuana purchasing location, Officer Sottile believed that the defendant could have been involved in narcotics trafficking during that 2019 trip.  (Id. 25:4-18).  Turning to the defendant's current trip, Officer Sottile observed that the defendant was travelling from the Dominican Republic, which, as Officer Sottile believed, was a country from which narcotics were frequently trafficked into the United States.  (Id. 7:10-15).  Taking these facts together, on the day of the defendant's arrival on August 30, 2021, Officer Sottile believed that the defendant may have been involved in narcotics trafficking during the August 2021 trip to the Dominican Republic.  (Id. 37:21-38:1).[2]

The day of the defendant's arrival at JFK, Officer Sottile was waiting for the defendant just outside the primary inspection area in JFK's Terminal 5.  (Id. 26:8-16; 74:20-75:1). Officer Sottile met the defendant outside the primary inspection area, introduced himself as a CBP officer and told the defendant that he was going to perform a secondary inspection.  (Id. 26:13-

---

[2] The defendant asserts in his supplemental memorandum that "[a]s far as Officer Sottile remembered nothing suspicious happened between 2019 and August 2021" involving the defendant.  ECF No. 33 (Aug. 25, 2023) ("Def. Supp. Mem.") at 2.  That misrepresents Officer Sottile's testimony, insofar as it suggests that Officer Sottile was affirmatively aware that "nothing suspicious" occurred relating to the defendant between 2019 and August 2021.  Rather, Officer Sottile testified that he "didn't do a deep dive into other incidents that [the defendant] had" and, as far as he knew, the defendant had not been involved in other incidents between 2019 and August 2021 (Tr. 41:2-10).

2

25).  Officer Sottile was wearing plain clothes with his badge visible and carried a firearm which was tucked into his clothing and not visible.  (Id. 27:6-23).  As Officer Sottile led the defendant to the secondary inspection area, he did not show the defendant his weapon, tell the defendant he was armed or place his hands on the defendant.  (Id. 27:1-2; 27:24-28:2).  At no point during the secondary inspection was the defendant placed in handcuffs or told he was under arrest.  (Id. 29:2-6).

At the outset of the secondary inspection, Officer Sottile obtained a "binding declaration" from the defendant that the bag on his person was his, that the items inside belonged to him and that he packed the bag.  (Id. 29:10-14).  After the defendant confirmed that the bag was his, Officer Sottile opened the bag.  (Id. 29:14-15).  While searching the defendant's bag, consistent with his training and experience, Officer Sottile engaged the defendant in conversation and asked the defendant questions about his trip to the Dominican Republic and about any prior incidents in which the defendant had been arrested or had money taken from him.  (Id. 29:16-22).  Officer Sottile explained that, in general, the purpose of engaging passengers in conversation while searching their bags is to "to get a baseline and see if they're nervous, [if] their responses are normal, and make sense."  (Id. 11:4-9).  As part of his training, Office Sottile was trained on how to interview passengers and detect if they are being truthful.  (Id. 18:13-22).

In response to Officer Sottile's inquiry, the defendant initially stated that he had never had money seized from him.  (Id. 29:20-30:1; 45:24-46:15; 47:12-15; 47:22-23; 48:1-3).  Having previously read the lookout information for the defendant, Officer Sottile immediately recognized that to be a lie.  (Id. 30:23-31:7).  Only after Officer Sottile asked the defendant a second time whether he had ever been arrested or had money seized from him did the defendant answer truthfully and admit that he had had money seized from him in 2019.  (Id.)  Officer Sottile

3

then asked the defendant what the money that had been seized was going to be used for; the defendant responded that said he was going to buy a dog. (Id. 30:3-5). After Officer Sottile asked what kind of dog the defendant had planned to buy, the defendant said he did not know because a friend had given him the money to buy the dog. (Id. 30:5-8). After Officer Sottile asked the defendant why his friend did not bring the money himself to purchase the dog, the defendant changed his story and said that the dog was not for his friend, but rather for his friend's brother. (Id. 30:8-10). After determining that the defendant's story was not credible—and telling the defendant so—Officer Sottile asked the defendant to call his friend so the friend could tell Officer Sottile what the money was for. (Id. 30:11-17). The defendant told Officer Sottile that his friend had died and that he did not have his friend's brother's telephone number. (Id. 30:17-19).[3]

At that point, Officer Sottile asked the defendant for his cell phone to look for evidence of drug trafficking activity. (Id. 30:21-22; 32:6-12). As Officer Sottile explained, he believed the defendant's 2019 trip from Dallas to Los Angeles was for the purpose of marijuana

---

[3] The defendant asserts that Officer Sottile did not ask the defendant about his "current reasons for travel," "did not check to see if the items in his luggage were consistent with [the defendant]'s explanation for travel," did not ask the defendant about "the purpose of his trip" and "did not inquire about narcotics trafficking, possession of contraband, or anything about what [the defendant] had been doing in the Dominican Republic." Def. Supp. Mem. at 3. The defendant suggests that Officer Sottile's purported failure to ask these questions amounted to a deviation from the "standard line of inquiry for secondary inspections." (Id.) This is wrong and suggests a curious standard approach to investigating crime at an airport. The defendant's imagined colloquy would have every secondary inspection begin with a full-scale interrogation of whether the person is a drug trafficker. Officer Sottile took a more subtle and sensible tack here. Though Officer Sottile did not explicitly ask the defendant if he had been trafficking narcotics in 2019 or 2021, by asking the defendant about his 2019 trip and by assessing the defendant's demeanor and the credibility of his responses, Officer Sottile was asking questions relevant to his assessment of whether the defendant was engaged in narcotics trafficking. Further, asking "baseline" questions to assess whether a passenger is "nervous" and whether "their [] responses are normal, and make sense"—which is exactly what Officer Sottile was doing when the defendant began providing responses that did not make sense to him—is part and parcel of a typical secondary inspection.

trafficking and that "the story [the defendant] was giving [Officer Sottile]" in August 2021 about that same trip, "didn't make any sense." (Id. 32:6-10).[4] Officer Sottile planned to review the cell phone for evidence of "large sums of cash and large amounts of narcotics" because Officer Sottile believed that the defendant might have been engaged in narcotics trafficking on the trip to the Dominican Republic in 2021. (Id. 37:15-38:1).

      The defendant gave Officer Sottile his cell phone in the powered on, locked position. (Id. 32:13-18). Officer Sottile asked the defendant to unlock the phone, to which the defendant responded, in sum and substance, "you're the government, you can unlock it yourself, no?" (Id. 32:21-23). In sum and substance, Officer Sottile responded that CBP could unlock the phone but it would need to be sent to a lab to do so and that process might take several months.[5] (Id. 32:23-25; 33:8-9; 33:11-12). In response, the defendant apologized to Officer Sottile, unlocked the phone and handed it back to Officer Sottile. (Id. 33:1-5). Officer Sottile then asked

---

[4] It is irrelevant that Officer Sottile "admitted he did not know if the [defendant's] answers were consistent with the answers [the defendant] provided to law enforcement in 2019. Def. Supp. Mem. at 3. Officer Sottile, who is trained in conducting interviews and assessing passengers' truthfulness, made his own independent assessment that the defendant's answers were not credible.

[5] The defendant asserts that Officer Sottile admitted during the hearing that he knew that if the defendant's cell phone were sent to the lab a forensic search would be conducted. Def. Supp. Mem. at 4. That is a gross misconstruing of Officer Sottile's testimony. Officer Sottile testified repeatedly that the purpose of sending the phone to the lab was to unlock the phone. (Tr. 66:19-25; 67:10-17). Officer Sottile never testified that the lab would conduct an "extraction," as the defendant claims in his supplemental memorandum, Def. Supp. Mem. at 4, and Officer Sottile's answers clearly reflect that he would have sent the phone to the lab for the purpose of opening the phone only. In fact, the defendant improperly asked Officer Sottile to confirm that the lab would "not [be] conducting a manual search like the one you do." (Tr. 68:19-20). Officer Sottile never answered that question because the Court sustained the government's objection to an improper question that asked Officer Sottile to opine on precisely what the lab would do, after Officer Sottile testified repeatedly that he did not know what the lab would do and that his goal in sending the phone to the lab was simply to unlock it. (Id. 68:19-22).

5

the defendant for the phone's passcode, which the defendant provided. (Id. 33:2-15). Officer Sottile explained that he requested the passcode consistent with his general practice to ensure that he could continue to access the phone if the phone automatically locked without having to have the passenger repeatedly open it. (Id. 19:3-9; 33:13-18). At no point during this interaction did Officer Sottile threaten the defendant in any way; throughout the interaction Officer Sottile's demeanor towards the defendant was calm and cordial. (Id. 33:6-12; 31:8-13).

After receiving the phone from the defendant in the unlocked position, Officer Sottile placed the phone in airplane mode and began reviewing the phone through a "basic" search. (Id. 33:19-23). Officer Sottile explained that a "basic" search of a cell phone is a manual search whereby the officer examines the phone by looking through various applications on the phone. (See id. 20:5-21). The search is conducted solely with the officer's "eyes and . . . hands" and the phone is "not . . . uploaded into a computer [and] no electronic devices are attached to it." (Id. 20:12-21).

Officer Sottile manually reviewed the defendant's cell phone for approximately five minutes before he encountered images he recognized to be child pornography.[6] (Id. 33:23-

---

[6] At some point after beginning the review, the cell phone locked and Officer Sottile had to re-enter the passcode to unlock it. (Id. 37:1-14). The defendant suggests that Officer Sottile provided inconsistent answers regarding the length of various aspects of the secondary inspection. Def. Supp. Mem. at 5. That is incorrect. Officer Sottile testified that he found the images of child pornography on the defendant's phone approximately 10-15 minutes after beginning the secondary inspection, Tr. 35:5-8, and approximately five minutes after he began his search of the defendant's phone, Tr. 77:24-78:1. These answers are not inconsistent. Officer Sottile did not begin his search of the defendant's phone immediately upon commencing the secondary inspection. He began the secondary inspection and after a few minutes he began searching the phone. Officer Sottile then continued his manual search of the defendant's phone after finding the images of child pornography, and the entirety of his search took approximately three and a half hours. (Id. 68:23-69:6). Nothing in Officer Sottile's recounting of events is inconsistent.

34:2; 77:24-78:1).  Officer Sottile also found photographs of money and what appeared to be narcotics.  (Id. 38:4-8).  After discovering these images, Officer Sottile alerted his supervisor and Homeland Security Investigations ("HSI") Special Agent Shannon Christie, and the defendant was escorted to a private search room.  (Id. 34:14-35:4).  In Officer Sottile's opinion, based on his training and years of experience as a CBP officer, nothing about the secondary inspection of the defendant deviated from CBP's standard practices in similar cases.  (Id. 36:13-20).[7]

## II.    ARGUMENT

As in his opening brief, the defendant argues that his provision of his passcode was a compelled statement in violation of the Fifth Amendment and was an un-Mirandized statement, also in violation of the Fifth Amendment.  The defendant further argues that the warrantless manual search conducted by Officer Sottile violated the Fourth Amendment and that the search was not supported by reasonable suspicion.  Finally, the defendant argues that the good faith doctrine is inapplicable here.  Nothing from the evidentiary hearing affects these

---

[7] Any slight inconsistencies between Officer Sottile's testimony during the August 14, 2023 evidentiary hearing and his summary report of the August 30, 2021 incident or statements he provided to Special Agent Christie or to the government are immaterial and do not impact the legal analysis applicable here.  The defendant highlights that in order to open the phone Officer Sottile "ordered [the defendant] to hand him the device," whereas he purportedly told Special Agent Christie that he "found the device" as part of his border search.  Def. Supp. Mem. at 4. Beyond the fact that these two versions are not actually inconsistent, the differences are meaningless.

The defendant also asserts that Officer Sottile's testimony that "after he obtained the device it was turned off and locked . . . contradicted [] his prior statements where he said the 'subject voluntarily presented the phone in a powered on and unlocked position' and never mentioned that [the defendant] initially handed [Officer Sottile] the phone in a locked position." Id.  Though Officer Sottile wrote in his summary report of the incident that the phone was presented in the unlocked position, he explained at the hearing that the post-incident report is a summary and does not include every detail of the secondary search, such as, in this case, that the phone was initially presented in the locked position and then the defendant unlocked the phone and gave it back to Officer Sottile, or that the phone died at some point during Officer Sottile's inspection.  (See Tr. 54:18-55:22).

7

arguments and, for the same reasons discussed in the government's initial opposition brief, these arguments are all meritless.

      A.      <u>The Defendant's Disclosure of His Phone's Passcode Was Not Compelled</u>

A statement is "compelled" in violation of the Fifth Amendment only when, "considering the totality of the circumstances, the free will of the [person making the statement] was overborne." <u>United States v. Washington</u>, 431 U.S. 181, 188 (1977). "Factors to be considered in making a determination of voluntariness include, but are not limited to, the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." <u>United States v. Mast</u>, 735 F. 2d 745, 749 (2d Cir. 1984). "In evaluating whether [a statement] is voluntary, courts must be mindful of a distinction between 'choices which are physically or psychologically coerced and those which are merely difficult. Only the former are void under our law.'" <u>United States v. Zimmerman</u>, 480 F. Supp. 3d 446, 455 (E.D.N.Y. 2020) (quoting <u>United States v. Mullens</u>, 536 F. 2d 997, 1000 (2d Cir. 1976)).[8]

The defendant's argument that the provision of his cell phone's passcode was compelled in violation of the Fifth Amendment is incorrect and should be rejected. Nothing about the interaction between Officer Sottile and the defendant bears the hallmarks of an interrogation that produces a compelled statement and there is nothing to suggest that the defendant's "free will . . . was overborne" by Officer Sottile's questioning. <u>Washington</u>, 431 U.S. at 188.

---

[8] Though the defendant argues that the "overborne will" and "voluntariness analysis" outlined in <u>Washington</u> and its progeny do not apply here, the defendant only cites pre-<u>Washington</u> cases for this proposition. Indeed, even the law review article cited by the defendant concedes that "[t]he Supreme Court last offered a definition of 'compulsion' some four decades ago" in <u>Washington</u>. Lawrence Rosenthal, <u>Compulsion</u>, 19 U. Pa. J. Const. L. 889, 893 (2017). Further, <u>Mast</u>, <u>Zimmerman</u> and <u>United States v. Wilson</u>, 100 F. Supp. 3d 268 (E.D.N.Y. 2015) each apply some combination of the overborne will / voluntariness analysis pronounced in <u>Washington</u>.

8

As Officer Sottile's testimony made clear, the interaction between Officer Sottile and the defendant was cordial throughout. The interaction lasted approximately 10-15 minutes before Officer Sottile found the child pornography on the defendant's phone. The entirety of the secondary inspection prior to when the defendant provided Officer Sottile with the passcode occurred in the secondary inspection area where other individuals were present. Officer Sottile never threatened the defendant or otherwise forced him to provide the phone's passcode. Rather, Officer Sottile merely advised the defendant of his options: provide the passcode or have CBP unlock the cell phone at its lab, which might take a long time. The defendant was never threatened with any show of force, was never touched during the secondary inspection, was never handcuffed and was never told he was under arrest. Officer Sottile asked him only one time for the passcode and, after initially balking at the request, the defendant decided to provide the passcode. While the defendant's decision to provide his passcode rather than be deprived of access to his phone for a potentially long period of time may have been a difficult one to make, it was not a "physically or psychologically coerced" one. Zimmerman, 480 F. Supp. 3d at 455.

Cases that the defendant has cited for the first time in his supplemental memorandum are all inapposite. This case is unlike United States v. Munoz, in which a district court in the Southern District of New York held that a police officer's knowing misrepresentation that the police could and would obtain a search warrant if the registered tenant of the home the police wished to search did not consent to the search. United States v. Munoz, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013). In finding that the tenant's consent to search was involuntary, the court explicitly distinguished the circumstances in the case at bar with those "in which the police represent accurately their intent or ability to obtain a search warrant." Id. at 446. Here, Officer Sottile did not make any misrepresentations to the defendant. Rather, he truthfully said that if the

9

defendant did not open the phone himself, CBP would seize the phone and send it to its lab to be unlocked.

United States v. Eggers is also distinguishable. See United States v. Eggers, 21 F. Supp. 2d 261 (S.D.N.Y. 1998). There, officers obtained a homeowner's consent to search after the homeowner initially steadfastly refused. Only after the homeowner was handcuffed while in police custody and told that 97% of people the officers arrested were convicted and that she was "in a lot of trouble," "facing a lot of jail time" and "would be better off if [she] cooperated with" the investigation, did the homeowner consent to the search. Eggers, 21 F. Supp. 2d at 269-70. The conversation between Officer Sottile and the defendant that resulted in the defendant voluntarily unlocking his phone and providing Officer Sottile with the passcode does not even remotely resemble the conversation and the degree of coercion present in Eggers.

B.   The Defendant's Disclosure of His Phone's Passcode Did Not Violate Miranda

For Miranda warnings to be required, a court must find both that (1) there was an "interrogation" of the defendant, and (2) the interrogation was while the defendant was in "custody." United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011). The meaning of "custody" under Miranda is narrower than the meaning of a "seizure" under the Fourth Amendment, and "not every seizure constitutes custody for purposes of Miranda." United States v. Schaffer, 851 F.3d 166, 175–76 (2d Cir. 2017). The Supreme Court has "[made] clear that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody," which is not accorded "'talismanic power,' because Miranda is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" United States v. Shatzer, 559 U.S. 98, 113 (2010) (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). Further, "custody for Miranda purposes is not coterminous with . . . the colloquial understanding of custody." FNU LNU, 653 F.3d at 144. In determining whether a defendant is in

10

Miranda custody, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983).

The defendant's argument that the provision of his cell phone's passcode was made in violation of Miranda and its progeny is incorrect. The parties agree that the defendant was not Mirandized and was not free to leave the secondary inspection area during the secondary inspection. However, neither of these facts is dispositive. See Shatzer, 559 U.S. 98, 113 (2010). No novel issue is presented here, where the defendant was subjected to a secondary inspection at the border. In FNU LNU, the Second Circuit held that a passenger subjected to a secondary inspection during a border search was not in custody for Miranda purposes despite explicitly finding that the traveler "was not, in fact, free to go." FNU LNU, 653 F.3d at 155.

The court should not reach a different conclusion here, as the defendant was never in Miranda custody during the secondary inspection. Officer Sottile did not physically restrain the defendant—either by placing his hands on him or placing him in handcuffs—and did not tell the defendant he was under arrest. The questioning of the defendant lasted less than 15 minutes when the defendant provided the passcode to Officer Sottile. At the time the defendant provided his passcode, Officer Sottile was asking the defendant questions a traveler would typically expect to be asked when arriving into the country; namely, questions about his trip and about prior travels. Here, everything about the secondary inspection conducted by Officer Sottile was routine. Under these circumstances, the Court should reject the argument that the defendant was in custody during the secondary inspection.

C.  The Manual Search of the Defendant's Phone Did Not Violate the Fourth Amendment

The defendant's argument that CBP was required to obtain a search warrant or needed probable cause before conducting the basic search of the defendant's cell phone is incorrect as a matter of law. As discussed in detail in the government's initial brief in opposition to the defendant's motion to suppress, no court, either pre- or post-Riley, has ever held that a search warrant is required to conduct a manual review of a cell phone at an international border. See United States v. Wanjiku, 919 F.3d 472, 485 (7th Cir. 2019). Indeed, no court, either pre- or post-Riley, has held that probable cause, or even reasonable suspicion, is required to conduct a manual search of a cell phone at the border.[9]

The recent decision in United States v. Smith, No. 22-CR-352 (JSR), 2023 WL 3358357 (S.D.N.Y. May 11, 2023)—which is not binding on this court—is distinguishable from the instant case and does not change the relevant analysis. In Smith, the district court denied a motion to suppress based on the good faith exception while holding that the forensic extraction of a cell phone and all of its contents was unreasonable. There, the defendant was under investigation by law enforcement agents at HSI and the Federal Bureau of Investigation ("FBI"), who asked CBP officers to search Smith upon his return to Newark Liberty International Airport from Jamaica. CBP agents obtained Smith's cellphone and passcode and made a forensic copy of the phone without a warrant. Id. at *3. Thirty-eight days later, after law enforcement had begun reviewing the forensic copy, the government obtained a warrant to search the phone. Id. at *3. The district court in Smith found that the border search violated Smith's Fourth Amendment rights

---

[9] The defendant's citation to United States v. Aguiar, 737 F.3d 251 (2d Cir. 2013) is inapposite. That case involved the warrantless search of a cell phone two months after it was seized from the defendant's vehicle. Id. at 263. Those facts are unlike the border search at issue here.

12

on the basis that the search in that case was unreasonable, in part because of that court's view that searches of the contents of individuals' cell phones do not appropriately fall within the border search exception due to the strong privacy interests implicated by such searches. Id. at *16. However, the district court acknowledged that the holding was an outlier and "more protective than the approach of any circuit court to consider the question and that "of the five federal courts of appeals to consider the question [at the time of writing], none has gone quite this far." Id. at *9-11. The court ultimately declined to suppress the contents of the phone, applying the good faith exception. Id. at *13. Specifically, the court noted that "given the historic breadth of the 'border search exception'" and relevant case law, "a reasonable government agent could have a good faith belief" that the border search was permissible and that a 2018 CBP directive expressly warranted such a search. Id. The court further found that fruits of the cell phone search were not subject to suppression because the government properly informed the Magistrate Judge of the circumstances surrounding the search in the warrant application. Id. at *14.

The Court should decline to apply Smith or extend its logic to the facts here. As an initial matter, the standard set out in that non-binding opinion has never been endorsed by the Second Circuit or any of the other circuits to have considered the question; a fact the district court itself recognized. Furthermore, there are at least two critical distinctions between the instant case and Smith. First, in Smith, the agents conducting the examination at the border were part of a team that had been investigating Smith and the border search was part of a pre-planned operation based on the agents' knowledge that Smith had left the country and would re-enter. Id. at *2. The agents in that case requested that CBP stop Smith at the border to aid in their ongoing investigation of an alleged conspiracy. Id. In this case, however, Officer Sottile's decision to manually review the defendant's cell phone was a product of Officer Sottile's review of a CBP lookout, his own

13

observations of the defendant at the border, and his real-time questioning of the defendant at the border.

Second, the search in Smith was unlike the search conducted here. In Smith, a full forensic examination of the device was conducted, in which the entirety of the device was copied and stored for 38 days pending the agents' review over multiple weeks. That is nothing like what occurred here. Officer Sottile conducted a manual review of the phone, using his "eyes and . . . hands," during which time he looked for and confirmed the suspicions that set him out to review the phone in the first place. (Tr. 20:12-21, 77:24-78:1). The privacy intrusions highlighted by the district court in Smith are simply not present here, as the forensic examination of the defendant's cell phone occurred only after a magistrate judge found probable cause and issued a warrant for the forensic examination of the device.

For the same reasons, the Court should decline to follow the other non-binding authorities cited in the defendant's brief. In United States v. Kim, the D.C. Circuit held that the "imaging and search of the entire contents of [the defendant]'s laptop, aided by specialized forensic software, for a period of unlimited duration and an examination of unlimited scope, for the purpose of gathering evidence in a pre-existing investigation, was supported by so little suspicion of ongoing or imminent criminal activity, and was so invasive of [the defendant]'s privacy and so disconnected from not only the considerations underlying the breadth of the government's authority to search at the border, but also the border itself, that it was unreasonable." 103 F. Supp. 3d 32, 59 (D.C. Cir. 2015). Similarly, United States v. Aigbekaen involved the warrantless forensic search of three of a traveler's devices. 943 F.3d 713, 718 (4th Cir. 2019). Here, Officer Sottile conducted a five-minute manual review of the defendant's cell phone as part of a routine

14

border inspection before discovering the images of child pornography, not as part of an ongoing investigation of the defendant. Accordingly, both Kim and Aigbekaen are inapplicable.

Further, even assuming Officer Sottile needed reasonable suspicion to conduct the manual search of the defendant's cell phone, he had such reasonable suspicion. The Supreme Court has defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981). The standard is met when law enforcement can point to "specific and articulable facts" that lead to the inference that criminal activity "may be afoot." Terry, 392 U.S. at 30. "Reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience." Abidor v. Napolitano, 990 F. Supp. 2d 260, 282 (E.D.N.Y. 2013) (citing United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985)). An analysis of whether reasonable suspicion exists also considers an officer's background and training, United States v. Cotterman, 709 F.3d 952, 967 (9th Cir. 2013), and the context of the situation as a whole, United States v. Ruiz, 785 F.3d 1134, 1141 (7th Cir. 2015). In the border search context, the Second Circuit has provided a number of factors that can support a finding of reasonable suspicion, including nervous or unusual conduct, tips from informants, travel itinerary, discovery of incriminating matter during routine searches, inadequate luggage and evasive or contradictory answers. United States v. Asbury, 586 F.2d 973, 976 (2d Cir. 1978).

As discussed above, Officer Sottile was a seasoned interviewer who was trained in assessing passengers' truthfulness. He assessed the defendant to be "nervous" and that his answers to Officer Sottile's questions "were crazy" and "didn't make any sense." (Tr. 31:14-17). The defendant initially lied to Officer Sottile when he told him that he had never had money seized from him. (Id. 30:23-31:7). Officer Sottile had a reasonable basis to believe that the defendant

15

could have been involved in narcotics trafficking during the 2019 trip, based on the fact that the defendant had $37,000 seized from him en route to California and never sought to reclaim that money, and Officer Sottile knew that the defendant was traveling from the Dominican Republic, a known narcotics trafficking country, in August 2021. Taken together, this set of facts and circumstances clearly rose to the level of reasonable suspicion.

### D.     The Good Faith Exception Applies

The exclusionary rule "does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid." United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)).  Under the good faith exception, evidence collected pursuant to an invalid search warrant will be suppressed only if the issuing judge was knowingly misled, the issuing judge wholly abandoned her judicial role, the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable or the warrant is so facially deficient that reliance upon it is unreasonable. Falso, 544 F.3d at 125.  If the officer's reliance on the warrant was objectively reasonable, suppression is not warranted. See Leon, 468 U.S. at 922.

Even if the Court finds that Officer Sottile's search of the defendant's phone was unlawful, the Court should apply the good faith exception and deny the defendant's motion to suppress the evidence recovered from the phone.  As noted above, even in Smith—which was decided long after the border search at issue here—the Court applied the good faith exception in light of "the historic breadth of the 'border search exception'" and denied Smith's motion to suppress the evidence recovered from his cell phone. Smith, 2023 WL 3358357 at *13.  As discussed in the government's initial opposition brief, Officer Sottile had a good faith basis to

16

believe that his manual search of the defendant's cell phone was lawful and Special Agent Christie had a good faith basis to believe that her forensic search of the defendant's cell phone pursuant to a search warrant was lawful.

## CONCLUSION

For these reasons, and for the reasons articulated in the government's initial brief in opposition to the defendant's motion to suppress, the Court should deny the defendant's motion in its entirety.

Dated:   Brooklyn, New York
         August 28, 2023

                                                Respectfully submitted,

                                                BREON PEACE
                                                UNITED STATES ATTORNEY
                                                Eastern District of New York
                                                Attorney for Plaintiff
                                                271 Cadman Plaza East
                                                Brooklyn, New York 11201

                                    By:    /s/ Benjamin Weintraub
                                                Benjamin Weintraub
                                                Assistant United States Attorney
                                                (718) 254-6263